## AFFIDAVIT OF TASK FORCE OFFICER JEFFREY BROWN

I, Task Force Officer Jeffrey Brown, Drug Enforcement Administration, being duly sworn, depose and state as follows:

### Agent Background

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Detective Sergeant with the Middleborough Police Department, where I have been employed since 2012. In addition, since 2018, I have been assigned to the Financial Investigations Team of the New England Field Division of the Drug Enforcement Administration ("DEA") as a Task Force Officer. I am a graduate of the MBTA Transit Police Academy.

3. As a Middleborough Police Detective and DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the police academy and have attended additional specialized training courses in furtherance of my past and current assignments, including the Basic Narcotic Investigation course conducted and presented by the DEA training staff.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through

1

my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.    Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, weapons traffickers, and money launderers, including those employed to avoid detection by law enforcement. I am familiar with how drug traffickers often store drugs, weapons, and drug proceeds in storage sites commonly referred to as "stash houses," as well as various methods used to conceal and transport these items. I am also familiar with the terminology, slang, and coded language commonly employed by these individuals. I am aware of the prices commonly charged for various illegal narcotics and illegal weapons, the method of packaging, and the jargon used in their trade. I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities. Similarly, I am familiar with investigations regarding closely associated illegal activities commonly engaged in by drug trafficking organizations, especially the laundering of drug proceeds.

6.    Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities. I also know that drug traffickers are aware of law enforcement's use of electronic surveillance, and thus, frequently change cellular telephone numbers and cellular telephones, use multiple cellular

2

telephones simultaneously, use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), and use cellular telephones subscribed under a different person's name, in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

7.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the way drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the way drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

8.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. I have received advanced training and certifications in the extraction of data from mobile devices. Through this training and experience, I have learned that drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the

3

same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the street terms used by drug traffickers, as well as the methods they use to disguise conversation and operations.

### Purpose of Affidavit

9.      I submit this affidavit in support of an investigation involving Brayan ARANGO Sepulveda ("ARANGO") and others (collectively, the "Targets") for violations of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) (the "Target Offenses").  As detailed below, ARANGO was arrested on March 24, 2026, after arriving to purchase what he believed to be 8 kilograms of cocaine from an undercover agent posing as a drug dealer.  ARANGO arrived at the transaction with two other men, Andres RUIZ Ardila, and Juan MONTOYA Mejia, who maintained control over the $30,000 cash ARANGO planned to use as a downpayment on the drugs.  All three men were arrested and incident to their arrests, each was found to possess a cellular telephone on their person.

10.     This affidavit is being submitted in support of an application for a warrant to further search the following electronic equipment (the "Equipment"), seized on March 24, 2026:

a. An iPhone in a clear case, seized from the person of ARANGO (DEA Exhibit N-6);

11. The Equipment is in the possession of law enforcement investigators, as described in Attachment A-1. There is probable cause to believe that the Equipment contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

12. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. I submit this affidavit for the limited purpose of establishing probable cause for the requested warrant. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

**PROBABLE CAUSE**

13. On March 24, 2026, the Honorable Paul G. Levenson, United States Magistrate Judge, authorized a criminal complaint charging ARANGO with attempt to possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii) (the "Charged Offense"). The affidavit in support of the complaint is attached hereto as Exhibit 1, and incorporated fully herein by reference.

14. On March 26, 2026, the Honorable Paul G. Levenson, United States Magistrate Judge, authorized initial search warrants for the Equipment, as well as two other telephones seized from RUIZ and MONTOYA (the "Initial Equipment Warrants"). The affidavit in support of those search warrants is attached hereto as Exhibit 2, and incorporated fully herein by reference. Attachments B to the Initial Equipment Warrants limited investigators to seize records between January 1, 2026, through March 24, 2026, and, as edited by the Court, further

5

limited records relating to Targets' travel or whereabouts to just between March 5, 2026, and March 24, 2026.

15.    As detailed below, the records obtained pursuant to the Initial Equipment Warrants indicate that ARANGO and the Targets' drug-dealing activities extended well before January 1, 2026.  As such, there is probable cause to believe evidence of the Target Offenses dating back to at least July 1, 2025, will be found on the Equipment, the telephone utilized by ARANGO.

## TARGET OFFENSES BACKGROUND

16.    As detailed in Exhibit 1, in February 2026, investigators received information that ARANGO was looking to purchase large quantities of cocaine.  At the direction of investigators, a confidential source ("CS")[1] contacted ARANGO at telephone number 645-223-3140 (ARANGO Telephone) to set up a meeting to discuss the potential cocaine transaction.

17.    On March 5, 2026, ARANGO met with CS and an undercover agent (UC) posing as CS's drug-dealing associate to discuss the transaction. During this meeting, UC confirmed that ARANGO was looking to purchase multiple kilograms of cocaine.  As detailed in Exhibit 1, ARANGO discussed, among other things, the price he was currently paying for kilograms of cocaine; that he was looking to get a better price; and the fact that ARANGO's prior suppliers had been federally arrested recently.

18.    Investigators believe ARANGO was referring to previously having been supplied by Joel Betances, Noel Betances, and/or Reylin Segura, who were federally charged

---

[1] CS is cooperating in exchange for leniency in his pending federal criminal indictment for controlled substances distribution. CS's criminal history includes arrests for drug offenses, domestic violence and motor vehicle violations. CS was previously federally convicted of conspiracy with intent to distribute cocaine. Information provided by CS has been corroborated to the extent possible and CS is believed to be reliable.

with drug possession, distribution, and conspiracy charges in August 2025. *See United States v. Betances*, et al., 25-cr-10436-IT. In the week or two leading up to their arrest, investigators in that investigation received a photograph from a concerned neighbor of the defendants, suggesting that drug dealing was going on at the residence. That photograph captures the ARANGO Vehicle parked outside of the residence where investigators, a few weeks later, executed a search warrant and located approximately 70 kilograms of cocaine. Based on the above, I believe ARANGO admitted to having been involved in distributing large quantities of cocaine since at least August 2025.

19.    After the meeting with UC, ARANGO said he would be in touch to confirm the details of the cocaine transaction. ARANGO provided the ARANGO Telephone as the number UC should use to contact ARANGO. In subsequent calls and messages between UC and ARANGO, ARANGO agreed to purchase 8 kilograms of cocaine from UC, and agreed to pay a $50,000 down payment on those drugs.

20.    In subsequent conversations over the course of several days, UC and ARANGO agreed to meet on March 24, 2026, to conduct the transaction in which UC would purportedly provide 8 kilograms of cocaine. Ultimately, ARANGO agreed to deliver $30,000 to serve as the down payment. The parties agreed to meet in Framingham at an apartment complex.

21.    As detailed in Exhibit 1, on March 24, 2026, ARANGO arrived at the meeting location and used the ARANGO Telephone to contact the UC to announce his arrival. UC proceeded to meet ARANGO in the parking lot and the two spoke. During this conversation, ARANGO conveyed to UC that he did not have the money but that a second vehicle in the area had the cash. Shortly thereafter, the second vehicle drove to the area where UC and ARANGO were meeting. UC walked to that vehicle with ARANGO. Inside that second vehicle were two

males—RUIZ in the passenger seat and MONTOYA in the driver's seat. Inside the vehicle, RUIZ and MONTOYA showed UC a backpack containing the purported $30,000 down payment.

22.    UC and ARANGO then walked to the UC vehicle, which had a second UC inside. UC and ARANGO got into the back seat where UC showed ARANGO a cloth bag containing 8 bricks wrapped in tape and plastic wrap: 7 kilograms of sham cocaine, along with 1 kilogram of actual cocaine. ARANGO told UC he wanted to cut into the bricks to be able to test the product, but UC declined. ARANGO then inspected and handled the bricks, put them back in bag, and got out of the UC vehicle. While carrying the bag of the 8 bricks, ARANGO started walking away from the UC vehicle, at which point investigators intercepted ARANGO and placed him into custody.

23.    A search of ARANGO incident to his arrest revealed a loaded pistol in ARANGO's back waistband, a small quantity of suspected cocaine in his pocket, cash and his driver's license, and the cellphone (DEA Exhibit N-6) described in Attachment A-1, that is believed to be the ARANGO Telephone.

24.    Investigators also ordered RUIZ and MONTOYA out of their vehicle and searched the vehicle, as well as RUIZ and MONTOYA. At RUIZ's feet, in the front passenger seat, was the backpack shown to the UC which was found to contain an undetermined amount of US Currency, believed to be approximately $30,000. In the glove box, investigators located one plastic baggie containing a pink powdery substance, suspected to be Tusi, and three plastic baggies containing a white powdery substance, suspected to be cocaine. On the person of RUIZ, investigators found the cellphone (DEA Exhibit N-5), and on the person of MONTOYA, investigators found the cellphone (DEA Exhibit N-7). Investigators seized all phones pending

8

application of these Initial Equipment Warrants.

25.    RUIZ and MONTOYA, who were determined to be unlawfully present in the United States, were taken into ICE custody, and ARANGO was taken into federal custody and ultimately charged with the Charged Offense.  During a consensual interview with MONTOYA, MONTOYA told investigators, among other information, that he, ARANGO, and RUIZ worked for a Colombian drug trafficker whom he named but whose name I am withholding pending further investigation into the trafficker.  MONTOYA explained that he would deliver drugs for this drug trafficker when asked, and on this date MONTOYA was asked by that drug dealer to drive RUIZ to Framingham and that the drug dealer would pay him to do this task.

26.    Based on the above and the details set forth in Exhibit 1, there is probable cause to believe ARANGO, RUIZ, and MONTOYA committed the Target Offenses, and that ARANGO committed the Charged Offense.

**EVIDENCE FOUND ON THE EQUIPMENT**

27.    Pursuant to the Initial Equipment Warrants, investigators have searched and seized records within the scope of Attachment B to the warrant, that is, they have searched for and seized records between January 1, 2026, through March 24, 2026, and, as to records relating to Targets' travel or whereabouts, have limited their seizures to between March 5, 2026 and March 24, 2026.  Within those records, investigators have identified multiple communications indicating that ARANGO was involved in the Target Offenses before January 1, 2026.

28.    For example, on January 9, 2026, ARANGO asked the user of 857-391-8975 to get him "a square from the wall" ("cuadrito de la pared").  Based on training, experience, and the context of the exchange, I believe this is coded slang for illegal narcotics.  The user of 857-

9

391-8975 then asked ARANGO to confirm the request, and ARANGO confirmed it. I believe this demonstrates that both parties understood the coded language without needing any explanation. That kind of familiarity is consistent with long-standing narcotics trafficking relationships and supports the belief that this was not their first drug-related conversation.

29.    The communications between ARANGO and the user of 857-391-8975 continued through March 23, 2026. During that period, ARANGO told the user that he had $15,000. Notably, this is one day before ARANGO's arrest. When that statement is viewed alongside the earlier coded drug-related messages, it suggests ongoing narcotics activity and possible proceeds from drug trafficking. The fact that these exchanges continued from January through March 2026 further supports the belief that the relationship and criminal activity existed before January 1, 2026.

30.    ARANGO also communicated with the user of 786-561-5263, and those communications further support the belief that he was involved in illegal narcotics distribution with multiple individuals. In late January 2026, the user of 786-561-5263 sent ARANGO an image believed to show purple crystal methamphetamine. On February 3 and 4, 2026, the user of 786-561-5263 sent ARANGO a picture and video through WhatsApp showing what are believed to be illegal pills. In one of those exchanges, ARANGO asked, in substance, if he bought 1,000 pills and people did not like them, what would happen. The user of 786-561-5263 replied in a voice message, "I'm sure they will like them." I believe this exchange is consistent with the negotiation and distribution of illegal narcotics, specifically pills intended for resale or further distribution.

31.    On February 5, 2026, ARANGO spoke again with the user of 786-561-5263 and referred to "the last ones," which, based on the context, is believed to mean the same illegal

10

pills discussed in the earlier messages. ARANGO said he did not like the price of $11 per pill. The user of 786-561-5263 replied in a voice message that he had sold them to ARANGO for $10 per pill, sent them to ARANGO, and paid for the shipping. Before that exchange, the user of 786-561-5263 sent image of a USPS receipt dated January 3, 2026, for unknown shipment which indicated the shipper was somewhere in the Flaggers Miami, Florida area. I believe this evidence supports not just drug distribution, but also the shipment of suspected narcotics through the mail.

32.    Taken together, these communications show a pattern of coded language, price negotiations, quantity discussions, shipping arrangements, and images depicting suspected narcotics. These were not casual or isolated conversations. They are consistent with ongoing narcotics trafficking. Nor were these communications about small introductory quantities of narcotics. Rather, they are consistent with ongoing, large-scale narcotics trafficking. Based on the language used and the apparent established relationship between ARANGO and these subscribers, there is reason to believe relevant communications and evidence of narcotics activity existed before January 1, 2026.

33.    Additionally, as noted above, ARANGO disclosed that his previous cocaine suppliers, from whom he had been purchasing 20-25 kilograms every two weeks, had been arrested in August 2025, and ARANGO had been seen at these suppliers' residence shortly before their arrest. Based on this timing, I believe ARANGO must have been purchasing these 20-25 kilograms of cocaine before they were arrested in August 2025. Given ARANGO's description of purchasing "every two weeks," I believe ARANGO had been purchasing for at least 4 weeks—and likely even longer—before August 2025.

34.    For those reasons, I believe ARANGO has been involved in the Target Offenses

11

since at least July 2025, and likely for a much longer period of time. I therefore request that the Court expand the scope of Attachment B to authorize investigators to search for and seize records dating back to July 1, 2025.

**Probable Cause to Believe That the Equipment Contains
Evidence, Fruits, and Instrumentalities**

35.     As detailed above and in Exhibit 1, ARANGO utilized a cellular telephone to communicate with CS and UC, and to coordinate the anticipated 8 kilogram cocaine transaction. The Equipment was seized from ARANGO's person immediately after he retrieved what he believed to be 8 kilograms of cocaine from UC.  As detailed above, investigators have found numerous communications regarding drug trafficking on the Equipment with in the 2026 time frame already.  Based on these facts, and my training and experience with how drug traffickers routinely utilize cellular telephones in furtherance off their criminal activities, I believe ARANGO used the Equipment in furtherance of the Charged and Target Offenses and that evidence, fruits, and instrumentalities of these offenses will be located on the Equipment.

36.     As discussed above, the Equipment is currently being stored by investigators at their facilities as described in Attachment A-1. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

37.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished

12

through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

38.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. iPhones are a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

39.    From my training, experience, and information provided to me by other agents, I am aware that drug traffickers commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

40.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.    Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a

13

device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

41.    Based on all of the above, there is probable cause to believe ARANGO, committed the Target Offenses and the Charged Offense. There is further probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Equipment described in Attachment A-1.

14

Respectfully submitted,

/s/ Jeffrey Brown

_____

Jeffrey Brown
Task Force Officer
Drug Enforcement Administration

23

Subscribed and sworn via telephone in accordance with Fed. R. Crim. P. 4.1 on April __, 2026.

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

15

**ATTACHMENT A-1**
**DESCRIPTION OF THE EQUIPMENT TO BE SEARCHED**

An iPhone in a clear case, seized from the person of Brayan ARANGO Sepulveda on March 24, 2026 (DEA Exhibit N-6). The equipment is located DEA's New England Field Division's evidence storage in Bedford, Massachusetts. A photograph of the Equipment to be searched is included below (the face of a minor child has been redacted from the photo below).



## ATTACHMENT B
(Items to be Seized)

I. All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances) and 846 (conspiracy to distribute controlled substances and/or attempt to possess with intent to distribute controlled substances), for the time period July 1, 2025, through January 1, 2026, including those related to:

    A. The following people and/or telephone numbers:

        1. Brayan ARANGO Sepulveda

        2. Andres RUIZ Ardila

        3. Juan MONTOYA Mejia

    B. The following topics:

        1. Drug distribution and/or conspiracy to distribute drugs, packaging/transporting/shipping/manufacturing drugs;

        2. Money laundering and/or conspiracy to launder money;

    C. The payment, receipt, transfer, or storage of money or other things of value by ARANGO, RUIZ, and/or MONTOYA, or any coconspirators, including:

        1. Bank, credit union, investment, money transfer, and other financial accounts;

        2. Credit and debit card accounts;

        3. Business or personal expenses;

        4. Income, whether from wages or investments;

        5. Loans;

    D. The travel or whereabouts of ARANGO, RUIZ, and/or MONTOYA, or any

16

coconspirators, or other coconspirators;

E. The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

F. Evidence of who used, owned, or controlled the equipment;

G. Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

H. Evidence of the attachment of other hardware or storage media;

I. Evidence of counter-forensic programs and associated data that are designed to eliminate data;

J. Evidence of the times the equipment was used;

K. Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

L. Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

M. Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators.

II. Serial numbers and any electronic identifiers that serve to identify the computer equipment.

## DEFINITIONS

For the purpose of this warrant:

A. "Equipment" means any hardware, software, storage media, and data.

17

B. "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or

18

instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.

Law enforcement personnel are authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.